

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>STELLA MARIE APARICIO,<br><br>    Debtor.<br>_____<br>NORDSTROM fsb,<br><br>    Plaintiff,<br><br>v.<br><br>STELLA MARIE APARICIO,<br><br>    Defendant.<br>_____ | CASE NO. SV 05-99907 MT<br><br>Chapter 7<br><br>ADV. NO. 05-01373 MT<br><br>**MEMORANDUM OF DECISION**<br><br>Date:    October 3, 2005<br>Time:    2:00 p.m.<br>Place:   Courtroom 302 |

**Background**

    Defendant Stella Marie Aparicio is a middle-aged single parent who is raising a daughter on her own. Her daughter was seventeen as of the filing of the petition. For the past few years, Ms. Aparicio has worked as a clerk in the Los Angeles Superior Court, where she earned a gross annual salary of $36,000 per year, which amounts to roughly $2,500 per month in net income. In addition, she received $1,200 per month, in the form of cash or rent payments, from her partner, Fermin Pina, whom she had been in a

1.

relationship with for twelve years and had lived with for the last three years. Finally, Ms. Aparicio also received $600 in support payments from her daughter's father each month. Thus, Ms. Aparicio's total net income was approximately $3,800 up through August 2004.

In August and September 2004, Ms. Aparicio charged several thousands of dollars to her Nordstrom credit card. The charges were, in part, for food, clothing and other necessities, including for her daughter's educational expenses. Ms. Aparicio claims not to have made several charges at Tiffany & Co. in the amounts of $687.39 and $318.35 on August 11, 2004. She also claims that while she purchased a television at Circuit City on August 14, 2004 for $1,190.74, she subsequently returned the television, but to date has not been credited for this return. On August 20, 2004, Ms. Aparicio charged a total of $300 at the Johnny Thompson music store. Ms. Aparicio's final charge on her Nordstrom card was on September 11, 2004. By this time, Ms. Aparicio's credit balance exceeded her $8,000 credit limit by $127.

By September, the debtor's relationship with Mr. Pina had ended and Mr. Pina moved out. Additionally, her daughter's father stopped sending support checks. As a consequence, debtor's total net income plummeted to $2,500 per month.

Ms. Aparicio testified that she was ill on and off between July and December 2004 with gynecological problems, resulting in significant blood loss, back pain, headaches, hemorrhaging and weakness. This caused her to miss work sometimes, although mostly for half days. She missed one week of work in early September. The problem was ultimately determined to be a hormonal imbalance and was corrected. She incurred $300 in out-of-pocket medical expenses while the rest was covered by insurance.

Ms. Aparicio filed a voluntary petition under chapter 7 on December 15, 2004.

**Analysis**

Plaintiff Nordstrom fsb contends that, under 11 U.S.C. § 523(a)(2)(A), Defendant Stella Marie Aparicio should not be discharged of certain consumer debts, specifically credit card charges made by Defendant between August 8, 2004 through September 11,

2.

2004 in the amount of $4,557.01. Based on the September 13, 2005 Joint Pre-Trial Order Pursuant to Local Rule 7016-1(b), the dispute is limited to $2,196.48.

Section 523(a)(2)(A) provides, in pertinent part, that "[a] discharge under section 727 . . . does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by (A) false pretenses, a false representation, or actual fraud . . . ." To succeed on its Complaint, Plaintiff Nordstrom must show that:

(1) Debtor made a misrepresentation;

(2) At the time she knew her representations were false;

(3) She made these representations with the intention and purpose of deceiving Nordstrom;

(4) Nordstrom relied on her representations; and

(5) Nordstrom sustained a loss as a result of the misrepresentation.

See In re Hashemi, 104 F.3d 1122, 1125 (9th Cir. 1996); In re Anastas, 94 F.3d 1280, 1284 (9th Cir. 1996); In re Dougherty, 84 B.R. 653, 656 (9th Cir. BAP 1988).

There appears to be no issue on most elements of this cause of action. The debtor represented at the time she incurred the charges that she would pay them, and Nordstrom allowed the charges in reliance on those representations. Nordstrom has incurred a loss as a result of those representations. In a credit card nondischargeability action such as this, the critical inquiry is whether the individual charges were made with fraudulent intent. The parties have focused their evidence and arguments on whether the debtor knew she was planning on filing bankruptcy and, consequently, never intended to pay the charges she incurred.

Courts have developed a list of factors that trial courts should consider in attempting to determine the debtor's intent. The factors are:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3.

    3. The number of charges made;

    4. The amount of the charges;

    5. The financial condition of the debtor at the time the charges are made;

    6. Whether the charges were above the credit limit of the account;

    7. Whether the debtor made multiple charges on the same day;

    8. Whether or not the debtor was employed;

    9. The debtor's prospects for employment;

    10. Financial sophistication of the debtor;

    11. Whether there was a sudden change in the debtor's buying habits; and

    12. Whether the purchases were made for luxuries or necessities.

Anastas, 94 F.3d at 1284 n.1; Dougherty, 84 B.R. at 657. While this list of factors is non-exclusive, this list provides a useful structure for analyzing the evidence in this case. I discuss each of the above factors in turn below.

1)    <u>The length of time between the charges made and the filing of bankruptcy</u>

    The charges at issue were all made between August 8, 2004 and September 11, 2004. Debtor filed bankruptcy on December 15, 2004, three months and four days after the last charges were made on the Nordstrom card. Given the testimony concerning the loss of income to the debtor in September and her attempts to make some minimum payments on her credit cards after that, this timing appears to indicate that the debtor took approximately two months to realize fully that she could not easily reverse the financial decline she was in after the loss of income.

2)    <u>Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made</u>

    The uncontradicted testimony of the debtor was that she started to call around to compare the fees of different bankruptcy attorneys around the beginning of December. She chose Harriet Goldfarb because her fees were the lowest. Debtor paid Ms. Goldfarb $515 to file a no-asset Chapter 7 case.

Ms. Aparicio previously filed chapter 7 bankruptcy eleven years ago in 1993 and employed Ms. Goldfarb for that case as well.

Plaintiff argues that a debtor's previous bankruptcy and reemployment of the same attorney indicates an intent to discharge the debtor's consumer debt in a second bankruptcy filing. While this may often be the case under such facts, I do not find that they militate strongly in favor of such an inference in this case. Ms. Goldfarb is, in fact, one of the most reasonably priced consumer debtor counsel in the Los Angeles area, where no-asset Chapter 7 fees are regularly $800 to $1000. Ms. Goldfarb does a considerable amount of consumer debtor work in the Los Angeles area, so it is not really that unusual that Ms. Aparicio would find her again. While Ms. Aparicio testified that she shopped around to find out what bankruptcy attorneys were charging before she went back to Ms. Goldfarb, she does not appear to have actually spoken to a bankruptcy attorney until two and a half months after the last charges at issue.

In addition, if Ms. Aparicio had formulated a plan to run up her credit cards and then subsequently discharge this debt in a second bankruptcy filing based on knowledge acquired in 1993 from Ms. Goldfarb or through her exposure to legal issues while working in the clerk's office of the Family Law court, many of the actions she took in the year before she filed a second time would be inconsistent with such an intent. Ms. Aparicio made a payment on her Nordstrom card on February 3, 2005 for $2,500 when the minimum payment due was $21. If she had planned to eventually file bankruptcy again, she could have kept her credit card account open with a minimum payment. She also appears to have attempted to pay down other credit cards such as GAP and Providian. Her schedules indicate that any new charges on her credit cards stopped by September 2004 - the same month she found out her income would be drastically reduced.

Plaintiff's argument that the debtor formulated her intent to file bankruptcy earlier than December also contravenes the Plaintiff's response to Defendant's interrogatory number 5, admitted as Defendant's Exhibit 3. When asked if "Stella Marie Aparicio

5.

knew, on or before September 11, 2004, that she would be filing a bankruptcy," Plaintiff responded, "No. Not at this time."

3)   The number of charges made

There were fifteen charges made during the relevant time period, but three of these fifteen charges were disputed by Defendant at trial.

**Tiffany & Co.:** On August 11, 2004, there are two charges recorded at Tiffany's for $687.39 and $318.35, totalling $1005.74. No other information was provided by Nordstrom concerning these charges other than the account statement indicating the charges were routed through an account in New Jersey. No underlying charge slip or explanation was provided as to what item was actually purchased.

The debtor testified that she had no idea what these charges were and did not purchase anything at Tiffany's. She admitted that the charges made two days before the Tiffany's charges and two days afterwards were in fact made by her and stated that she did not lend her card to anyone.

**Circuit City:** On August 14, 2004, the debtor charged $1,190.74 at Circuit City for a 20-inch television set. She testified that her domestic partner, Fermin Pina, had said he would make the payments. Shortly after the purchase, Mr. Pina decided to end his relationship with the debtor and move out. When she realized that he would not pay for the television, she stated that she went back to Circuit City on August 28 and returned it. She only learned that Circuit City did not credit her account later when this litigation started. At that time, she went back to Circuit City and tried to get a record of the return. She said that Circuit City said the return was possibly credited to another credit card account and she was unable to get them to provide the records she wanted.

The disputed charges discussed above total $ 2,196.48. They appeared on the debtor's Nordstrom statement with a closing date of August 27, 2004. This statement required a minimum payment of $211 due by September 21, 2004.

Ms. Aparicio did not dispute the charges with Nordstrom after she received her

6.

statement reflecting the Tiffany's charges. She does not dispute that she knew how to initiate a dispute about an incorrect charge on her credit card, as she had disputed a charge earlier relating to a product which she never received. That dispute was resolved in her favor and Nordstrom credited her account. See Plaintiffs Exhibits D & E.

Ms. Aparicio stated that she did not call to dispute the three incorrect charges because her life was in such disarray at that time that she failed to examine the statement. She said she just looked at the minimum payment due and realized that she could not afford to make it. At the time this statement arrived, her partner had just moved out, reducing her monthly income by $1200. Her daughter's father had stopped paying $600 per month in child support because her daughter refused to go visit him. She had been sick with significant gynecological issues and was weak from constant bleeding.

I found that Ms. Aparicio was credible in her testimony. She was forthcoming in her answers and appeared to be honestly responding to all questions despite the uncomfortable and sensitive subject matter under discussion. Given her situation in September 2004 when this statement arrived, her testimony that she did not study the charges on the Nordstrom statement are credible. Her financial situation only worsened steadily in the next two months, making it increasingly unlikely that she would recognize the problem or even that she would be able to make the minimum payment.

Thus, I find that Ms. Aparicio's purchases during this period were not so numerous to indicate an intent to not pay for them.

4) <u>The amount of the charges</u>

The charges subject to this dischargeability action, including the three disputed by debtor, are alleged to be $5,048.55 in the Complaint. As I find that the Tiffany's and Circuit City charges are not properly attributable to the debtor, the amount at issue is limited to $2,852.07. The pretrial order states that solely $2,196.48 is at issue, which would seem to relate solely to the Circuit City and Tiffany's charges. Given that there was some confusion at trial as to what charges were included in this amount, however, I

7.

have evaluated all the charges in this time period. I find that either way, the amount of the charges does not indicate a credit card run-up with an intent to defraud.

5)    <u>The financial condition of the debtor at the time the charges are made</u>

The debtor made a payment of $100 on August 7 and $155 on July 17. At the time she incurred the charges in August and early September, it did appear that she had the ability to pay for the charges she had made. The testimony of debtor's expert witness, Tony Santana, was persuasive that, but for the loss of income in September, the debtor would have been able to pay these charges.

The evidence is uncontroverted that in August 2004 the debtor had $1,240 in disposable income. Although her income was only $2,500 a month, her living expenses were reasonable, and she received $1200 in reimbursement for her expenses from Mr. Pina and $600 from her daughter's father each month. The combined effect of the withdrawal of these two amounts in September reduced her household income from $4,300 in August to $2,500 in September. According to Mr. Santana, this reduced her monthly disposable income from $1,240 to a deficit of $560 per month.

While the charges in early September totaling $228.72 might have been after she knew Mr. Pina was moving out, it is unclear whether she was fully aware at that time that all future income from both Mr. Pina and the child's father was being withdrawn. In addition, these items were mainly for food and shoes, and do not indicate a sudden rush to run up credit in advance of bankruptcy.

6)    <u>Whether the charges were above the credit limit of the account</u>

The debtor did in fact exceed her credit limit by $127. This amount is not significant, and Ms. Aparicio would not have been over the limit if the Tiffany's and Circuit City charges had been properly credited.

Ms. Aparicio did request a credit limit increase on August 8, 2004, and was turned down due to her credit score. While this fact might indicate an intent to spend more than she knew she could repay, she also testified that she usually received extra money at the

8.

end of the summer from her daughter's father to pay for school clothes. It does not appear that she knew in early August that her daughter's father was cutting off all remaining support payments. In the entire context of the debtor's situation, this factor alone is insufficient to demonstrate a fraudulent intent.

7) <u>Whether the debtor made multiple charges on the same day</u>

Debtor did make up to four charges a day on a few days, but mostly this was in different departments of Nordstroms department store. There is no evidence of a spending spree or an indiscriminate run-up of the account.

8) <u>Whether or not the debtor was employed</u>; and

9) <u>The debtor's prospects for employment</u>

Ms. Aparicio was employed as a clerk at the Los Angeles Superior Court, Family Law Division. She had been employed there for many years and is still so employed. She appears to have had reasonable expectation of a steady income in the future from which to pay her debts.

Plaintiff has argued that the debtor made inconsistent statements about her income at trial, in her bankruptcy schedules and in the interrogatories, and therefore was not credible. The variations between the statements were between $100 and $200 a month, and I did not find the variances significant. The debtor appeared to be rounding off and not necessarily taking benefits into account in her trial statement, whereas it appears she may have been in her schedules. There really is no dispute that her gross income was in the range of $36,000 a year and that the reduction in income in September and subsequent months was $1,800.

10) <u>Financial sophistication of the debtor</u>

While Plaintiff argued that this debtor was sophisticated and planned this bankruptcy based on her earlier filing and her awareness of the law from working as a clerk, the court found the debtor to be rather unsophisticated financially. She testified that she thought she had purchased a Lexus car but returned it a short time later

9.

because she learned that it was a lease and not a sale she had entered into. This does not indicate much sophistication. In addition, the debtor's experience is in Family Law court and does not appear to be in connection with bankruptcy or commercial law matters. She demonstrated poor planning and shopping choices, given her income level, indicating a lack of awareness concerning her true financial situation.

11)    <u>Whether there was a sudden change in the debtor's buying habits</u>

Over the course of the account charges from October 2003 through the time period at issue, it appears the debtor's spending habits were consistent. There are regular charges throughout the one year period for eating out, going to theme parks, a vacation, a diet supplement product, higher quality shoes and clothing as well as groceries and gasoline. The only significant change in the debtor's buying habits appears to be the two Tiffany's charges and the Circuit City charge.

Although the court has already found that these disputed charges should not be attributed to the debtor in this proceeding, the lack of any other "big ticket" or luxury consumer goods item bolsters the debtor's testimony as well that she was spending with the belief that she would pay the bills over time, as she had in the past.

One item on August 20 charged at "Johnny Thompson Music" appeared unusual, given previous spending. However, the debtor explained in her testimony that this charge was made was in order to get the music store to release a trumpet Mr. Pina had bought on installments. He is a musician and needed the trumpet. He had promised to pay the bill, but it appears he reneged on that promise when he moved out.

12)    <u>Whether the purchases were made for luxuries or necessities</u>

While most of the purchases appear to be predominantly at what one would think of as "higher end" retail stores, the purchases themselves would not really be characterized as luxuries. They were for clothing and shoes required either for the debtor's work wardrobe or for her teenage daughter, along with a haircut for her daughter. The restaurant charges are also within reasonable amounts and are at

10.

moderately priced establishments. It is not the role of this court to say that the debtor should have been shopping at Walmart or Sears instead of Nordstroms and Saks, but instead to evaluate whether the extent of the luxury purchases might indicate an intent to defraud the creditor. These purchases are simply not so out of line that they indicate such an intent.

**Conclusion**

In summary, the testimony at trial demonstrated a single parent making $36,000 a year who got in over her head due to unexpected reductions in contributions she had been receiving for years from other sources. Plaintiff's arguments that she made poor choices leading up to this situation simply do not amount to evidence that the debtor intended to defraud Nordstrom. I find that the debtor had the ability to pay off this account at the time she incurred the debt and that she intended to do so. Circumstances following the charges led to her Chapter 7 filing. Accordingly, Plaintiff's debt to Nordstrom fsb may be discharged and judgment will be entered in favor of Ms. Aparicio.

DATED: 10/6/05

_____
MAUREEN A. TIGHE
United States Bankruptcy Judge

S:\MT\DG\aparicio.memo.wpd

## CERTIFICATE OF SERVICE BY MAIL

I certify that a true copy of this **MEMORANDUM OF DECISION** was mailed on __OCT 6 2005__ to the parties listed below:

Paul S. Marks
Holland & Knight LLP
633 West Fifth Street, 21st Floor
Los Angeles, CA 90071-2040

Ivan S. Lavinsky
CIR Law Services
8031 Linda Vista Rd.
San Diego, CA 92111

Dated: OCT 6 2005

DEPUTY CLERK